# United States Court of Appeals

## For the Eleventh Circuit

| | |
|---|---|
| No. 03-14908 | FILED<br>U.S. COURT OF APPEALS<br>ELEVENTH CIRCUIT<br><br>Aug 10, 2005<br><br>THOMAS K. KAHN<br>CLERK |
| District Court Docket No.<br>01-02620-CV-1-ODE | |

ANTHONY GEORGE BATTLE,

        Petitioner-Appellant,

versus

UNITED STATES OF AMERICA,

        Respondent-Appellee.

--------------------------------------------------

Appeal from the United States District Court
for the Northern District of Georgia

--------------------------------------------------

### JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

Entered:    August 10, 2005
For the Court:    Thomas K. Kahn, Clerk
By:    Pope, Joyce

ISSUED AS MANDATE
JUL 2 0 2006
U.S. COURT OF APPEALS
ATLANTA, GA.

A True Copy -- Attested:
Clerk, U.S. Court of Appeals.
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

BATTLE v. U.S.    3227

Anthony George BATTLE,
Petitioner–Appellant,

v.

UNITED STATES of America,
Respondent–Appellee.

No. 03–14908.

United States Court of Appeals,
Eleventh Circuit.

Aug. 10, 2005.

**Background:** Federal prisoner filed motion to vacate his second murder conviction and accompanying death sentence. The United States District Court for the Northern District of Georgia, No. 01–02620–CV–1–ODE, Orinda D. Evans, Chief Judge, denied the motion, and movant appealed.

**Holdings:** The Court of Appeals held that:

(1) district court's finding that movant was competent to stand trial was not clearly erroneous;

(2) district court's finding that movant consented, at least tacitly, to insanity defense was not clearly erroneous;

(3) Supreme Court decision in *Ring v. Arizona* did not apply retroactively on collateral review;

(4) any violation of rule which provided that an alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict did not prejudice movant, and therefore did not warrant postconviction relief; and

(5) district court's seating of two alternate jurors before penalty-phase deliberations did not violate statute providing that a capital defendant's sentencing

hearing shall be conducted before the jury that determined the defendant's guilt.

Affirmed.

**1. Criminal Law ☞1430**

Postconviction relief movant's claim that the district court, in view of his conduct at the beginning of and during his capital murder trial, should have concluded that his conduct raised a bona fide doubt about his competency to stand trial and should have held a competency hearing *sua sponte* or at the request of counsel, was a "procedural competency claim," otherwise known as a *Pate* claim, which could be waived by not being raised on direct appeal. 28 U.S.C.A. § 2255.

See publication Words and Phrases for other judicial constructions and definitions.

**2. Criminal Law ☞1436**

Postconviction relief movant's claim that he was tried and convicted of capital murder while he was, in fact, incompetent was a "substantive competency claim," and was not subject to procedural default even though movant failed to raise the claim on direct appeal.

See publication Words and Phrases for other judicial constructions and definitions.

**3. Criminal Law ☞1612(1)**

A postconviction relief movant raising a substantive claim of incompetency is entitled to no presumption of incompetency. 18 U.S.C.A. § 4241(a).

**4. Criminal Law ☞1615**

A postconviction relief movant raising a substantive claim of incompetency must demonstrate his or her incompetency by a pre-

Synopsis, Headnotes and Key Number Classification
COPYRIGHT © 2005 by West, a Thomson business

The Synopsis, Headnotes and Key Number Classification constitute no part of the opinion of the court.

3228                                    BATTLE v. U.S.

ponderance of the evidence.    18 U.S.C.A. § 4241(a).

**5. Criminal Law ⚌1655(5)**

To show entitlement to a hearing on a substantive incompetency claim, a postconviction relief movant must present clear and convincing evidence creating a real, substantial and legitimate doubt about his competence to stand trial; this standard of proof is high and requires that the facts positively, unequivocally, and clearly generate the legitimate doubt.    18 U.S.C.A. § 4241(a).

**6. Criminal Law ⚌1158(1)**

A district court's determination that there is insufficient evidence to generate a substantial and legitimate doubt as to a postconviction relief movant's competence to stand trial is reviewed for clear error.    18 U.S.C.A. § 4241(a).

**7. Criminal Law ⚌625.15**

District court's finding, after 12-day competency hearing, that defendant charged with capital murder, who consistently reported to doctors that he felt pains and sensations due to microchip implants that he alleged were put inside his body by prison staff to monitor and control him, was competent to stand trial, was not clearly erroneous; neither defendant's occasional exhibition of an antagonistic relationship with his lawyers over their representation of him, nor his courtroom outbursts, odd behavior, and history of mental illness mandated a finding of incompetency.    18 U.S.C.A. § 4241(a).

**8. Mental Health ⚌432**

Mental illness, as a matter of law, does not preclude a finding of competency to stand trial.    18 U.S.C.A. § 4241(a).

**9. Criminal Law ⚌1158(1)**

The Court of Appeals reviews for clear error the district court's finding of fact about a defendant's consent to a particular defense.

**10. Criminal Law ⚌1139**

The Court of Appeals reviews de novo the district court's legal conclusions about a defendant's claims that his Fifth and Sixth Amendment rights were violated at his trial on capital murder charges.    U.S.C.A. Const. Amends. 5, 6.

**11. Criminal Law ⚌641.13(2.1)**

District court's finding that, although defendant in capital murder prosecution at times was ambivalent about his insanity defense, he did consent, at least tacitly, to the defense, was not clearly erroneous.

**12. Courts ⚌100(1)**

Supreme Court decision in *Ring v. Arizona*, which held that a jury, not a judge, must find an aggravating circumstance necessary for imposition of the death penalty, announced a new procedural rule that did not apply retroactively to motion to vacate death sentence.    28 U.S.C.A. § 2255.

**13. Jury ⚌150**

Defendant who did not object to the trial court's failure to discharge alternate jurors at the close of guilt phase of his capital murder trial waived that objection.    Fed. Rules Cr.Proc.Rule 24(c), 18 U.S.C.A.

**14. Criminal Law ⚌1166.16**

Violation of rule which provided that an alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict is not per se reversible error.    Fed.Rules Cr.Proc.Rule 24(c), 18 U.S.C.A.

**15. Criminal Law ⟊1489**

Any violation of rule which provided that an alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict did not prejudice defendant in capital murder prosecution, and therefore did not warrant post-conviction relief for defendant, even if the asserted violation led to a violation of statute providing that a capital defendant's sentencing hearing shall be conducted before the jury that determined the defendant's guilt, when the court seated two alternates to deliberate during penalty phase. 18 U.S.C.A. § 3593(b); Fed.Rules Cr.Proc.Rule 24(c), 18 U.S.C.A.

**16. Sentencing and Punishment ⟊1779(1)**

District court's seating of two alternate jurors before penalty-phase deliberations in capital murder prosecution did not violate statute providing that a capital defendant's sentencing hearing shall be conducted before the jury that determined the defendant's guilt. 18 U.S.C.A. § 3593(b)(1).

---

Appeal from the United States District Court for the Northern District of Georgia.

Before EDMONDSON, Chief Judge, and BIRCH and BLACK, Circuit Judges.

PER CURIAM:

We hereby withdraw entirely our earlier opinion in this case.

Defendant–Appellant Anthony George Battle appeals from the denial of his 28 U.S.C. § 2255 motion collaterally attacking his second murder conviction and accompanying death sentence, which were affirmed by this Court in *United States v. Battle*, 173 F.3d 1343 (11th Cir.1999). From a certificate of appealability Battle presents six arguments to persuade us that his death sentence was imposed improperly. None of the arguments persuade us, and we affirm the district court's judgment.

*Background*

I. *The Facts Underlying Battle's Conviction*

Battle was serving a life sentence for the 1987 sexual assault and murder of his wife, Minnie Foreman, a United States Marine stationed at Camp Lejune. By 1993 Battle had been placed in Cellhouse C at the United States Penitentiary–Atlanta ("USP–A"). On 21 December 1994, correctional officer D'Antonio Washington was found lying on the floor of Cellhouse C with blood spurting out of his head. Battle was seen nearby standing beside a vending machine, his clothes splattered with blood. Behind the same vending machine a hammer with fresh blood on it was found. DNA analysis revealed the that the blood on Battle's clothing and on the hammer belonged to Officer Washington. A USP–A inmate/trustee, who was authorized to carry tools, testified that he loaned the hammer to Battle because Battle said he needed it to fix something in his cell.

Battle confessed to a correctional officer that same day that Battle had killed Officer Washington. On 26 January 1995, federal agents interviewed Battle, who told the agents that he felt he was getting "bossed around" at USP–A and that he thought he might get more respect by killing officer Washington. Battle also told the agents he was happy about Officer Washington's death and had no remorse whatsoever. During the interview Battle made no mention of the delusions he later claimed contributed to the killing.

3230                                    BATTLE v. U.S.

In November 1995, a grand jury indicted Battle for murder under 18 U.S.C. § 1118. The next month Battle filed a notice to rely on an insanity defense; the government noticed its intent to seek the death penalty in July 1996.

II.   *The Competency Determination*[1]

Before trial, Battle was evaluated by three defense experts and two government experts. The experts testified before a magistrate judge at the competency hearing, which lasted about twelve days.

The defense offered psychiatrists Drs. Davis and Woods, along with psychologist Dr. O'Hagan. Drs. Davis and Woods both interviewed Battle three times; Dr. O'Hagan interviewed Battle six times over a course of two months. Battle consistently reported a set of symptoms to the doctors: that he felt "pains and sensations" due to microchip implants that had been put inside his body by prison staff to monitor and control him. All defense experts agreed that, during testing, Battle generally was cooperative and fully oriented. The defense doctors all concluded Battle was suffering from paranoid schizophrenia and was incompetent to stand trial.

The government offered psychiatrist Dr. Johnson and psychologist Dr. Hazelrigg, both of whom were employed by the Bureau of Prisons. This evaluation took place over seventy-five days during which Dr. Johnson saw Battle about forty times and Dr. Hazelrigg about fifty times. Battle was likewise cooperative with the government's experts and reported to them the same symptoms as he had given defense experts. Drs. Johnson and Hazelrigg also saw Battle again about two weeks before the competency hearing.

At the competency hearing Dr. Johnson testified that she disagreed with the defense experts' diagnosis of paranoid schizophrenia. She said it was difficult to diagnose schizophrenia in an outpatient setting and that the defense experts did not spend enough time with Battle to substantiate their diagnoses conclusively.[2]  Both Drs. Johnson and Hazelrigg concluded that Battle suffered from personality disorders with schizotypal qualities but that he was not schizophrenic. These doctors opined that Battle was malingering in his symptom report about the implants and opined that he was competent to stand trial.

The magistrate judge issued a lengthy report recommending that Battle be found competent to stand trial. The district court "carefully reviewed the transcript and exhibits from the competency hearing and adopted the Report and Recommendation of [the magistrate judge]." *Unites States v. Battle,* 264 F.Supp.2d 1088, 1119 (N.D.Ga.2003). In concluding Battle was competent to stand trial, the district court found persuasive the seventy-five-day observations of Drs. Johnson and Hazelrigg and that Battle had not reported the implants to prison officials until after Washington's murder. *Id.* at 1119–20.

1.  A comprehensive account of the voluminous testimony on the issue of Battle's competency, both at the competency hearing and at the trial, is found in *United States v. Battle,* 235 F.Supp.2d 1301, 1306–25 (N.D.Ga.2001), and *United States v. Battle,* 264 F.Supp.2d 1088, 1108–27 (N.D.Ga. 2003).

2.  Dr. Johnson had also evaluated Battle in 1987 (after Battle was accused of killing his wife) and found personality disorders but no schizophrenia. Johnson noted that, although schizophrenic symptoms can wax and wane, schizophrenia is a disease of general deterioration, especially without treatment. Johnson found it significant that Battle, not having been treated for psychotic disorders during the last nine years, had "not shown any deterioration in his functioning" over that time. *Battle,* 264 F.Supp.2d at 1113.

III. *The Trial*

The time between the competency hearing and the trial was about three and a half months. Rather than hold another competency hearing at the start of the trial, the district court decided to observe Battle in court during jury selection to determine if a further competency evaluation was needed. Battle initially protested his being present in the courtroom for jury selection, but after an involved colloquy with the court[3] said, "Yes, I will participate in this .... I can be here." The court had ordered that Battle be medicated for the trial; but on the first morning of trial, the marshal reported to the court that Battle had refused to take his medication. The district court arranged to get advice on the psychiatric implications of Battle being unmedicated and ultimately discovered that Battle had not been on medication regularly or, at least, not for a long time. The court rescinded its order to medicate Battle involuntarily and ordered only that Battle be *provided with* medication during trial.[4] After the first day of voir dire, the defense asked for a continuance to have Battle evaluated again by one of the defense experts. Denying the request, the district court concluded that its observation of and interaction with Battle "reinforced the Court's view that Defendant was competent to stand trial." *Battle*, 264 F.Supp.2d at 1128.[5]

At times during the trial, Battle exhibited disruptive behavior, mainly by speaking out in front of the jury to correct or to agree with a witness. And before the jury was brought in for opening statements, Battle

told the court he wanted to be excused saying, "I'm not in agreement with my attorneys and the evidence that they have here on my behalf" and "[t]here's more credible evidence I would have preferred to have here in this case." Battle then told the trial court that he felt "pains and sensations" and that it was difficult for him to stay focused. The court observed Battle rocking back and forth in his chair at times during the trial.

Battle frequently indicated dissatisfaction with his lawyers: his lawyers were unwilling to present a defense based upon the implants Battle said he believed to be inside him. Battle also indicated his dissatisfaction with his lawyers' intent to portray him as schizophrenic. Nonetheless, Battle's lawyers proceeded with an insanity defense at trial based on Battle's giving them "implicit authority early on in rambling conversation." Neither Battle nor his lawyers told the trial court that Battle disagreed with the presentation of an insanity defense.

Over the objection of his lawyers, Battle testified as the first defense witness at the guilt phase of trial. He confessed to the murder of Officer Washington and acknowledged that he knew it was wrong to kill another human being. Battle also told the jury about his belief in the implants. The jury found him guilty.

During the penalty phase of trial, the court excused two jurors for inappropriate behavior and replaced them—before penalty phase deliberations—with two alternate jurors who had been present during the presentation of evidence at both the guilt and penalty phases. Battle also testified at the penalty phase,

---

3. In this colloquy, Defendant indicated that he had "been through this once before so I'm aware of what is to be taking place."

4. The district court indicated that its concern for Battle's medication was about courtroom securi-

ty, not about Battle's competency. *Battle*, 264 F.Supp.2d at 1128, 1172–74.

5. The court also noted that Battle's lawyers were free to have Battle examined in the evenings after the trial had recessed if they wished.

**3232**                    **BATTLE v. U.S.**

where he told the jury about Officer Washington, "The guy, you know, he acted like a dog. You know, he talked to you like a dog and, you know, he died like a dog." The jury recommended the death penalty, and the court sentenced Battle accordingly. Upon receiving his death sentence, Battle responded, "Could I just do away with the appeals and everything at this moment?"

### IV. *The Appeals*

Battle did appeal, however, raising thirteen separate issues on the direct appeal. We affirmed his conviction and sentence. *United States v. Battle*, 173 F.3d 1343, 1345 (11th Cir.1999). He later, in the district court under 28 U.S.C. § 2255, sought collateral review of the legality of his conviction and sentence. After reviewing the evidence adduced at trial, hearing testimony at the motion hearing and argument from counsel, the district court denied relief.

### *Discussion*

In his argument that the district court erred in declining to set aside his conviction and death sentence, Battle raises six issues: (1) Whether the district court erred in finding Battle competent to stand trial and in failing to hold another competency hearing at the beginning of trial; (2) Whether Battle's Fifth and Sixth Amendment rights were violated by presentation of an insanity defense; (3)(a) Whether the indictment's failure to include capital statutory aggravating factors provides Battle with grounds for relief, and (b) Whether the Federal Death Penalty Act

is unconstitutional; (4) Whether the district court erred in dismissing two jurors and seating alternate jurors for penalty phase deliberations; (5) Whether the district court erred in declining to have Battle's § 2255 motion randomly assigned to another judge; and (6) Whether the district court erred in limiting the scope of post-conviction discovery.[6]

### I. *The Competency Claims*

Battle argues that his due process rights were violated because the district court found Battle competent to stand trial and declined to hold another competency hearing at the beginning of trial. In so arguing, Battle blurs the inquiry between a procedural competency claim, which can be waived, and a substantive competency claim, which cannot.[7] We see merit in neither claim.

[1] Battle contends the district court—in view of his conduct at the beginning of and during trial—should have concluded that his conduct raised a "bona fide doubt" about his competency to stand trial and should have held a competency hearing *sua sponte* or at the request of counsel. *See James v. Singletary*, 957 F.2d 1562, 1570 (11th Cir.1992). This claim is a procedural competency claim, otherwise known as a *Pate* claim. *Id.* at 1570–71 (explaining procedural competency claim under *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966)). Because Battle failed to raise this claim on direct appeal, *Battle*, 173 F.3d at 1345 n. 2,

---

6. After careful review of the law and record, we readily conclude issues (3)(b), (5) and (6) lack serious merit and will say no more about them.

7. Battle does not specify the source of this due process right and cites cases reviewing state court convictions invoking due process protec-

tions under the Fourteenth Amendment. Because we are reviewing a federal court conviction, we will construe Battle's due process claim as one under the Fifth Amendment. *See Clark v. Beto*, 359 F.2d 554, 557 n. 9 (5th Cir.1966).

he has waived it. *See James*, 957 F.2d at 1572 (observing that "*Pate* claims can and must be raised on direct appeal").[8]

[2]  Battle also contends that he was tried and convicted while he was, in fact, incompetent. This claim is a substantive competency claim. *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir.1995). Battle also failed to raise this claim on direct appeal. But this kind of claim "is not subject to procedural default and must be considered on the merits." *Id.* at 1111.

[3–6]  Incompetency means "suffering from a mental disease or defect rendering [defendant] mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). "[A] petitioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his or her incompetency by a preponderance of the evidence." *Medina*, 59 F.3d at 1106 (quotations and citation omitted). To show entitlement to a hearing on his substantive incompetency claim, Battle must present "clear and convincing evidence creating a real, substantial and legitimate doubt [about] his competence to stand trial." *Id.* (quotations and citation omitted). This standard of proof is high; and "the facts must positively, unequivocally, and clearly generate the legitimate doubt." *Id.* (quotations and citation omitted). "A district court's determination that there is insufficient evidence to generate a substantial and legitimate doubt as to a petitioner's competence to stand trial is reviewed for clear error." *Id.*

[7]  To meet his burden, Battle mainly relies on (1) his self-reported symptoms to

his lawyers about the implants and his frustration with his lawyers' failure to find the implants or to present the implants to the jury, coupled with (2) his disruptive courtroom behavior during trial. He also points to the history of mental illness, the alleged error in his competency determination, and his lawyers' representations that he was not competent during his trial.

That Battle at times exhibited an antagonistic relationship with his lawyers over their representation of him is no indicator of incompetency. Many criminal defendants differ with their lawyers on how best to represent them. In addition, the district court found that Battle did not exhibit an unequivocal complaint about the implants until August 1995 in an interview with a defense psychiatrist—well after the murder and initial investigation—and found Battle was faking this reported symptom.

Neither do Battle's courtroom outbursts, odd behavior, and history of mental illness mandate a finding of incompetency. "[N]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a *present* inability to assist counsel or understand the charges . . . . Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Medina*, 59 F.3d at 1107 (quotations and citations omitted) (emphasis added).

[8]  Not long before the trial, Battle did receive a fair and thorough competency determination. This hearing lasted about twelve days and involved many witnesses, five of whom were either psychiatrists or

---

8.  Even had Battle properly preserved this claim, we agree with the district court that the claim

would fail on the merits. *See Battle*, 264 F.Supp.2d at 1128–29.

psychologists who had evaluated Battle. After considering the extensive testimony from both sides, the district court found the government's witnesses—who had evaluated Battle over a longer and more consistent period of time—more persuasive and found Battle competent. The record supports the district court's decision; faced with "diametrically opposite expert testimony," a district court does not clearly err simply by crediting one opinion over another where other record evidence exists to support the conclusion. *Johnston v. Singletary*, 162 F.3d 630, 639 (11th Cir.1998).[9]

After revisiting the extensive factual history of Battle's murder trial (over which it presided) and hearing new testimony at the 2255 proceeding on Battle's behalf, the district court found that Battle not only had the ability to understand, but actually did understand, the nature of the charges against him and their resultant potential consequences. Likewise, the district court found Battle had the ability to, and did indeed, assist his counsel in preparing for his trial by discussing the facts of his case in detail before trial and by cooperating with defense investigators. Moreover, the trial judge observed and interacted with Battle throughout the trial and found Battle's responses to the court and his decisions to be rational. Nothing in the record—even taking one thing with another—indicates the district court clearly erred in its findings. In sum, Battle has failed to hurdle the high standard required to prevail on a substantive competency claim.

II. *The Insanity Defense Claim*

[9, 10] Battle claims that his Fifth and Sixth Amendment rights were violated: he contends his lawyers presented an insanity defense at trial over his objection. We review for clear error the district court's finding of fact about Battle's consent to a particular defense; we review de novo the district court's legal conclusions about Battle's constitutional claims. *Thompson v. Nagle*, 118 F.3d 1442, 1447 (11th Cir.1997).

[11] Battle relies on his lawyers' post-conviction declaration saying he did not want an insanity defense. The district court, however, found that Battle did consent, at least tacitly, to an insanity defense—although at times he was ambivalent about it. After reviewing the record we conclude that the district court's factual finding that Battle consented to the presentation of an insanity defense was not clearly erroneous.

Noting that Battle neither publicly objected to an insanity defense (as he publicly objected to many things during the trial that he did not like) nor testified to that effect at his 2255 proceeding, the district court nonetheless accepted the idea that Battle did not "want" to be portrayed as insane because he felt such a label was insulting. The 2255 court also accepted that Battle was dissatisfied with his trial lawyers' defense strategy because they refused to present evidence about the implants to the jury. But these things are different ideas than that Battle's

---

9. At the 2255 proceeding, the district court also admitted into evidence a declaration by one of Battle's trial lawyers, public defender Stephanie Kearns, that stated Battle was "mentally ill" at the time of trial. The district court found Kearns's declaration unpersuasive and found it odd that Kearns is now stalwart in her assertion that Battle was incompetent at trial despite her choice not to raise Battle's competency as an issue on direct appeal. We conclude Kearns's declaration is unpersuasive for an additional reason: mental illness, as a matter of law, does not preclude a finding of competency to stand trial.

lawyers actually overbore his will and presented an insanity defense over his objection.[10]

We cannot conclude that the district court clearly erred in finding that Battle consented to the insanity defense.[11]

### III. *The Failure to Indict Aggravating Factors*

[12] Battle argues his death sentence should be vacated because, he contends, the government did not include in the indictment the aggravating factors necessary to support his death sentence. *See e.g.,* 18 U.S.C. §§ 3591(a)(2)(A) ("intentionally killed the victim"), 3592(c)(3) ("Previous conviction of offense for which a sentence of death or life imprisonment was authorized."). Battle reasons that, because the Supreme Court in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002), characterized the aggravating factors necessary to support the death penalty under Arizona law as "'the functional equivalent of [ ] element[s] of a greater offense,'" *id.* (quoting *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 2365 n. 19, 147 L.Ed.2d 435 (2000)), for Sixth Amendment jury-trial guarantee purposes, it follows that the Federal Death Penalty Act ("FDPA") intent and statutory aggravating factors must be charged in the indictment for Fifth Amendment grand-jury clause purposes.

This appeal is not one of direct review. It is one of collateral review per § 2255. Bat-

tle's argument is based on the Supreme Court's decision in *Ring.* But *Ring* was decided after Battle's case was final on direct review. And *Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review. *Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 2526, 159 L.Ed.2d 442 (2004) (analyzing *Ring*'s retroactivity under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)). Thus, *Ring*—even if it otherwise extends to the facts of a case like this one—could not invalidate Battle's conviction and sentence now.

By the way, we doubt Battle could show prejudice, even if his argument was not barred by *Teague.* The indictment did include this statement: "[T]he defendant, Anthony George Battle, while confined in a federal correctional institution, ... under a sentence of life imprisonment imposed on January 25, 1988, ... did unlawfully and with malice aforethought commit the murder of D'Antonio Washington, by beating D'Antonio Washington with a hammer, in violation of Title 18, United States Code, Section 1118." And the evidence was strongly against Battle.

### IV. *The Seating of Alternate Jurors for Penalty Phase Deliberations*

Battle presents two arguments contending that the composition of his penalty-phase

---

10. The record instead indicates that Battle's ambivalence before and during the trial stemmed from his frustration at the lack of an "implant" defense, not from the rejection of an insanity defense. For example, just before opening statements and as part of Battle's request to be excused from the proceedings in protest of his lawyers' handling of his case, Battle told the court, "I'm not in agreement with my attorneys and the evidence that they have here on my behalf" and that, "[t]here's more credible evidence I would have preferred to have here in this

case." After the court told him he needed to stay, Battle responded, *"It's not so much I'm not in agreement with my attorneys.* I'm in slight pain. I feel slight pain sensations, also. So I'm in a little discomfort also, and ... I would have to really go to great length to endure the situation." (Emphasis added). Battle attributed the "sensations" to the implants.

11. Because of our conclusion, we have no occasion to address Battle's Fifth and Sixth Amendment claims.

3236                                    BATTLE v. U.S.

jury was improper, thus requiring reversal of his sentence. First, he argues that the trial court violated Rule 24(c) of the Federal Rules of Criminal Procedure by failing to discharge the alternate jurors when the jury retired to deliberate during the guilt phase of the trial. Second, Battle argues that the trial court's Rule 24(c) violation, followed by its seating two alternates for penalty-phase deliberations, led to a violation of 18 U.S.C. § 3593(b), which provides that a capital defendant's sentencing hearing shall be conducted "before the jury that determined the defendant's guilt." *Id.* § 3593(b)(1).

[13–15] The version of Rule 24(c) in effect at the time of Battle's trial provided that "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." Fed. R.Crim.P. 24(c) (1998).[12] At the outset we observe that Battle did not object to the trial court's failure to discharge the alternate jurors at the close of the guilt phase; so he has waived that objection. *Cf. United States v. Acevedo*, 141 F.3d 1421, 1423 n. 2 (11th Cir. 1998) (noting possibility that counsel can waive a Rule 24(c) violation by failing to object). Even had Battle preserved the claim, it would fail because a Rule 24(c) violation is not a per se reversible error; and Battle has shown no prejudice.[13] *See id.* at 1424.

[16]  Battle's second juror-related claim is that the district court—by seating two alternate jurors before penalty-phase deliberations—violated his statutory right to have his sentencing hearing conducted "before the

jury that determined [his] guilt." 18 U.S.C. § 3593(b)(1). The court seated these alternates after discharging two jurors for just cause during the penalty phase of Battle's trial. The alternates had been present during the presentation of evidence for both guilt and penalty phases; they were absent from the guilt-phase deliberations.

The Seventh Circuit has addressed this issue under strikingly similar circumstances and concluded that a trial judge's seating an alternate juror to be a part of penalty-phase deliberations did not violate § 3593(b), observing that "[t]he statute makes no provision for the situation that occurred here, leaving it to the good sense of the judges to deal with." *United States v. Johnson*, 223 F.3d 665, 670 (7th Cir.2000).

We agree with the Seventh Circuit. Section 3593(b) guarantees capital defendants a bifurcated proceeding: a guilt phase and a penalty phase. The section does *not*, however, guarantee that the penalty decision will necessarily be made—as a matter of right—by the same jury that determined the defendant's guilt. *See* 18 U.S.C. § 3593(b)(2)(C) (providing for sentencing hearing before different, newly-impaneled jury if guilt-phase jury has been discharged for good cause). The trial court's retention of alternates was a wise decision and proved its worth by allowing the court to avoid possibly declaring a mistrial after a complex capital case had been ably presented by both parties over the course of several weeks.

Moreover, Battle presents no serious argument that he was prejudiced. He asserts

---

12.  That rule was amended in 1999 to allow a district court to retain alternate jurors after deliberations begin so that an alternate juror may be substituted during deliberations if necessary. Fed.R.Crim.P. 24(c)(3).

13.  Battle claims prejudice by arguing the Rule 24(c) violation led to a § 3593(b) violation when the court seated two alternates to deliberate during penalty phase. Because we see no prejudice to Battle from the seating of the alternates, this claim fails.

BATTLE v. U.S.                     3237

that an alternate juror—once seated—would not have the benefit of guilt-phase deliberations and that it might be difficult for that alternate to dissuade the other jurors from recommending the death penalty if they are already in substantial agreement. But in federal capital penalty-phase deliberations, a single juror has the power to thwart a death sentence without persuading anyone: he simply needs to vote against the death penalty and the defendant will then be sentenced to life in prison. So, Battle's prejudice argument is meritless.

### Conclusion

For all of the foregoing reasons, we affirm the district court. The stay of execution on Battle's death sentence is lifted.

AFFIRMED.

A True Copy - Attested:
Clerk, U.S. Court of Appeals,
Eleventh Circuit

Deputy Clerk
Atlanta, Georgia

U.S. Court of Appeals, Eleventh Circuit—West, a Thomson business, Saint Paul, Minn.